IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

| | |
|---|---|
| **ROBERT L. MCNEAL,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | **CIVIL ACTION** |
| v. ) | |
| ) | **Case No. 08-2472-CM** |
| **MATT LOSEE,** ) | |
| ) | |
| **Defendant.** ) | |
| ) | |

## MEMORANDUM AND ORDER

Plaintiff Robert L. McNeal brings this civil rights action *pro se*, alleging that defendant Matt Losee, a police officer with the Leawood, Kansas police department, violated the Fourth and Fourteenth Amendments when he pulled plaintiff over for a traffic infraction. Plaintiff, an African-American, claims that defendant pulled him over because of his race and detained him longer than necessary and asked invasive questions because of his race. The case is before the court on Defendant's Motion for Summary Judgment (Doc. 17).

### I. FACTUAL BACKGROUND[1]

On August 26, 2008 at 8:37 p.m., defendant was in his patrol car at the side of the road on Sherwood Avenue, near the intersection with 127th Street in Leawood, Kansas. It was dark outside and the patrol car's headlights were off. Defendant had the interior lights of the patrol car on, completing paperwork. He observed two vehicles—a commercial van followed by a pick-up truck—leave a gated residential community. Defendant turned on his headlights and followed the vehicles. The driver of the commercial van turned right onto Nall Avenue. Plaintiff, who was

---

[1] The court construes the facts in the light most favorable to plaintiff as the non-moving party pursuant to Fed. R. Civ. P. 56. The court has included only those facts which are relevant, material, and properly supported by the record.

driving the pick-up truck, activated his left turn signal and pulled into a designated left turn lane. In less than 100 feet, plaintiff then activated his right turn signal and moved at a sharp angle, without stopping, from the dedicated left turn lane, across the middle lane and right turn lane, and onto Nall Avenue. Plaintiff did not fully occupy the dedicated right turn lane and did not align the right side of the vehicle with the right hand curb of the roadway.

The movement of the pick-up truck violated Kan. Stat. Ann. § 8-1548, which provides that:

(a) No person shall turn a vehicle or move right or left upon a roadway unless and until such movement can be made with reasonable safety, nor without giving an appropriate signal in the manner hereinafter provided.
(b) A signal of intention to turn or move right or left when required shall be given continuously during not less than the last one hundred (100) feet traveled by the vehicle before turning.

The movement of the pick-up truck also violated Kan. Stat. Ann. § 8-1545, which provides that: "(a) The driver of a vehicle intending to turn shall do so as follows: (1) Right turns. Both the approach for a right turn and a right turn shall be made as close as practicable to the right-hand curb or edge of the roadway."

After the improper lane change, defendant pulled the pick-up truck over. Plaintiff advised defendant that he was an electrician, just getting off work. Defendant requested plaintiff's proof of insurance and driver's license. Plaintiff provided his driver's license, but was unable to find proof of insurance. The driver's license showed plaintiff's address as Olathe, Kansas. Plaintiff then advised defendant that the license plate on truck was from another vehicle, as he didn't have the money to pay for new tags.

When defendant provided dispatch with plaintiff's driver's license and vehicle information, dispatch advised defendant that (1) plaintiff had no warrants; (2) plaintiff was showing a prior weapons violation of 12/06; (3) plaintiff had a J19—meaning a valid driver's license with traffic

citation history; and (4) the pick-up truck was not registered in Kansas or Missouri.  Defendant left his patrol car, returned to plaintiff, and asked him whether he was living in Olathe or Kansas City, Missouri.  Plaintiff advised that he was living in Kansas City, Missouri.  After a period of time, Plaintiff was able to produce proof of insurance.

After completing paperwork in his vehicle, defendant asked plaintiff to step to the rear of his vehicle, where defendant returned plaintiff's documents to him and provided plaintiff with a traffic citation for switched tags and a courtesy notice for a lane violation, and told plaintiff that he was free to go.  After advising plaintiff that he was free to go, defendant asked plaintiff whether he had a past weapons violation, beginning a 1½ minute conversation.  Plaintiff responded that he had been charged by the Olathe police department for having a pocket knife, but that he beat the charge and filed a suit in federal court.  Defendant again told plaintiff that he was free to go, and plaintiff returned to his vehicle.  Plaintiff then came back to defendant, asking if the weapons charge was showing on his record.  Defendant advised that he did not know if it said whether it was dismissed or what it was showing, and plaintiff returned to his vehicle and left the scene.  This exchange took approximately 1 minute.  From the time defendant activated his lights to the time that plaintiff pulled away in his vehicle, about 19½ minutes passed.

Plaintiff claims that during the time plaintiff was out of his car, defendant used aggressive actions and used a "show of force or authority with back up present."  "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380 (2007).  The court has reviewed the video of the traffic stop a number of times.  The video is inconsistent with plaintiff's representation that defendant acted aggressively and with a show of force or authority.  While the video shows that

plaintiff himself became agitated, it does not show any provocation on the part of defendant.

From the time defendant first observed plaintiff's pick-up truck up until the time he pulled it over and approached plaintiff's vehicle, defendant maintains that he never observed the driver of the pick-up and did not know the age, race, ethnicity, gender, or any other identifying characteristics of the driver. According to defendant, it was not until defendant approached plaintiff's vehicle on foot that he became aware of plaintiff's race. Plaintiff attempts to controvert this evidence, but as explained later in this opinion, plaintiff's argument rests on unreasonable inferences and unsupported allegations.

No member of a racial or ethnic minority has ever made a complaint against defendant, and no individual has ever filed a complaint alleging selective enforcement, preferential or differential treatment, or improper acts based upon an individual's race or ethnicity. The Leawood Police Department has never given defendant a warning, reprimand, or any type of disciplinary action based on improper treatment of a citizen in carrying out his duties as a Leawood police officer.

Plaintiff submitted a number of police videos to the court, attempting to show that defendant did not treat Caucasians the same as he treated plaintiff. The videos, depicting a range of different traffic stops under varying circumstances and times of the day, do not support the inference that plaintiff suggests. Rather, they demonstrate a consistent pattern of behavior by defendant that was well-mannered and respectful to all drivers he encountered in the videos. The court acknowledges plaintiff's point that in the videos, defendant did not ask any of the other drivers to exit the car and that most of the other traffic stops did not take as long as plaintiff's did. But the court cannot make a reasonable inference from the videos that defendant's treatment of plaintiff on August 26, 2008 was inconsistent with defendant's treatment of other motorists.

## II. STANDARDS FOR JUDGMENT

Summary judgment is appropriate if the moving party demonstrates that there is "no genuine issue as to any material fact" and that it is "entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). In applying this standard, the court views the evidence and all reasonable inferences therefrom in the light most favorable to the nonmoving party. *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir. 1998) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

Because of plaintiff's *pro se* status, the court affords him some leniency in construing his complaint. *Asselin v. Shawnee Mission Med. Ctr., Inc.*, 894 F. Supp. 1479, 1484 (D. Kan. 1995) (citation omitted). The court may not, however, assume the role of advocate for plaintiff simply because he is proceeding *pro se*. *Hall v. Bellmon*, 935 F.2d 1106, 1110 (10th Cir. 1991). The court should not "construct arguments or theories for the plaintiff in the absence of any discussion of those issues." *Drake v. City of Fort Collins*, 927 F.2d 1156, 1159 (10th Cir. 1991) (citations omitted). Nor should the court "supply additional factual allegations to round out a plaintiff's complaint or construct a legal theory on a plaintiff's behalf." *Whitney v. New Mexico*, 113 F.3d 1170, 1173–74 (10th Cir. 1997) (citation omitted).

### III. DISCUSSION

Defendant raised qualified immunity in his answer and briefly mentioned it in his opening brief in support of summary judgment. But defendant did not base his arguments on qualified immunity. In his response brief, plaintiff explained at length why qualified immunity is not appropriate here. Defendant then addressed it in his reply brief.

Under these circumstances, the court determines that defendant did not properly raise qualified immunity as an issue to determine on this summary judgment motion. The court therefore will not evaluate whether defendant is entitled to qualified immunity, and will examine the

arguments and evidence that defendant properly raised in his motion instead.

## A. Fourth Amendment Claim

### *1. Validity of the Stop*

Under the Fourth Amendment, a traffic stop is valid if it is based on an observed traffic violation. *See United States v. Botero-Ospina*, 71 F.3d 783, 787 (10th Cir. 1995). The police officer's subjective reason for stopping a vehicle is irrelevant in determining whether the driver's Fourth Amendment rights were violated. *Whren v. United States*, 517 U.S. 806, 812–13 (1996). In this case, because defendant witnessed a traffic violation by plaintiff, the stop itself was valid.

Plaintiff's complaint with the stop is centered on his belief that it was racially-motivated and pretextual. "[T]he Constitution prohibits selective enforcement of the law based on considerations such as race. But the constitutional basis for objecting to intentionally discriminatory application of laws is the Equal Protection Clause, not the Fourth Amendment. Subjective intentions play no role in ordinary, probable-cause Fourth Amendment analysis." *Id.* at 813. The Fourth Amendment is the wrong avenue for plaintiff's claim that his stop was racially-motivated. *See United States v. Adkins*, 1 F. App'x 850, 851 (10th Cir. 2001) (citing *Whren*, 516 U.S. at 813; *Botero-Ospina*, 71 F.3d at 787) ("[T]he fact that Defendant may have an equal protection claim against the arresting officer has absolutely no bearing on whether the officer's traffic stop was reasonable under the Fourth Amendment.").

Defendant is entitled to summary judgment on any claim plaintiff is making that the initiation of the stop violated the Fourth Amendment.

### *2. Length of the Traffic Stop*

From start to finish, the traffic stop lasted 19½ minutes, including the 1½ minute exchange after defendant first told plaintiff he was free to go and the 1 minute that plaintiff extended the stop

by returning to talk to defendant again about the weapons charge. During this time, defendant ran a background check on plaintiff, allowed plaintiff time to find his insurance card (which took over ten minutes), inquired about the different addresses showing on plaintiff's license and the record from dispatch, wrote plaintiff's citation and courtesy notice, and presented them to him. Plaintiff alleges that the time it took to process a turn signal infraction was unreasonable, representing that it took 35 minutes. The court is unsure how plaintiff computed that the traffic stop took 35 minutes, as the number is not supported by the record.

In many situations, the reasonableness of a detention involves factual inquiries that must be submitted to a jury. Here, however, the evidence does not raise a genuine issue of material fact as to whether the length of the stop was reasonable. To the contrary, the uncontroverted evidence shows that as a matter of law, the length of the traffic stop was reasonable. While defendant may have pulled plaintiff over for a turn signal infraction, a number of other factors complicated the background check: plaintiff had tags on his vehicle that did not belong to the vehicle; plaintiff initially could not find his insurance card; plaintiff had not changed his address on his driver's license although he had moved; and plaintiff's record showed a weapons violation. When a driver's own conduct contributes to a delay, he may not then label the delay as "unreasonable." *See United States v. Shareef*, 100 F.3d 1491, 1501 (10th Cir. 1996) (citations omitted). The constitution permits an officer to detain a driver for the time reasonably necessary to complete a computer check on a car and driver and issue a citation or warning. *United States v. Cervine*, 347 F.3d 865, 871 (10th Cir. 2003); *United States v. Holt*, 264 F.3d 1215, 1222 (10th Cir. 2001). The court concludes that, as a matter of law, the length of the traffic stop did not exceed the constitutionally-permissible limit.

### *3. Request to Exit the Vehicle*

Plaintiff complains that defendant asked him to exit the car. But "once a motor vehicle has

been lawfully detained for a traffic violation, the police officers may order the driver to get out of the vehicle without violating the Fourth Amendment's proscription of unreasonable searches and seizures." *Pennsylvania v. Mimms*, 434 U.S. 106, 111 (1977); *Holt*, 264 F.3d at 1222 ("An officer also may order the driver and passengers out of the vehicle in the interest of officer safety, even in the absence of any particularized suspicion of personal danger.") (citations omitted). Interests of officer safety outweigh the intrusion of asking a driver to step out of the vehicle. *Id.* Particularly in light of plaintiff's weapons violation, defendant's request did not violate the Fourth Amendment.

### *4. Inquiry Regarding Weapons Violation*

Finally, plaintiff alleges that defendant's inquiry regarding plaintiff's weapons violation violated the Fourth Amendment. Defendant returned plaintiff's documents and told plaintiff he was free to go before asking about the weapons violation. Both plaintiff and defendant were walking to their cars when defendant asked the question. But plaintiff claims that he did not feel free to go, and that defendant's "actions" spoke louder than his words. Plaintiff claims that defendant was aggressive in his manner.

As previously mentioned, the content of the video directly contradicts plaintiff's representation of defendant as aggressive. The video does not create a genuine issue of material fact as to whether defendant acted aggressively; to the contrary, it conclusively disproves plaintiff's allegation. The court is cognizant that it must view all properly supported facts in the light most favorable to plaintiff at this stage of the proceedings, but to read aggression into defendant's behavior in the video is untenable. And plaintiff's subjective feeling that he was not free to leave is irrelevant; the question is whether, *objectively*, plaintiff had reasonable cause to believe that he was not free to go. *Shareef*, 100 F.3d at 1501 (citation omitted). Under the totality of the circumstances, the uncontroverted evidence shows that the traffic stop became consensual before defendant inquired

about the weapons violation.

## B.  Equal Protection Claim

The resounding theme in plaintiff's papers is that defendant pulled him over because of his race.  To support a claim of racially selective law enforcement, plaintiff's burden is two-fold: he must demonstrate that defendant's actions (1) had a discriminatory effect and (2) were motivated by a discriminatory purpose.  *Marshall v. Columbia Lea Reg'l Hosp.*, 345 F.3d 1157, 1168 (10th Cir. 2003) (citation omitted).  Although the discriminatory purpose does not need to be the sole purpose, it must be a motivating factor in the decision.  *Id.* at 1168.  At the summary judgment stage of proceedings on an equal protection claim, a plaintiff must present evidence suggesting a reasonable inference that the police officer was motivated by a discriminatory purpose and that his actions had a discriminatory effect.  *Id.*  "[A] police officer's pattern of traffic stops and arrests, his questions and statements to the person involved, and other relevant circumstances may support an inference of discriminatory purpose in this context."  *Id.*

One uncontroverted fact is significant in considering plaintiff's equal protection claim: plaintiff has not submitted facts controverting defendant's statement that he did not know the race of plaintiff before approaching the vehicle on foot.  Plaintiff's unsupported suggestion that "it is possible to reasonably infer the race of the driver in the video, because if you can see that plaintiff's window[s] are not tinted . . . and that you can't see the driver, then it stands to reason that the driver in [the] video was black" is insufficient to create a genuine issue of material fact as to whether defendant was aware of plaintiff's race before he pulled him over.  And plaintiff's additional argument that defendant must have been able to discern his race because defendant was able to read the first vehicle's license plate without a tag light is also unsupported; the record contains no evidence that the licence plate was unlit by a tag light or other light.  To the contrary, the video

-9-

shows that the headlights of plaintiff's vehicle were shining on the first vehicle as they passed defendant. It is impossible to infer discriminatory purpose if defendant did not know plaintiff's race before he decided to stop him. *See United States v. Aliperti*, No. 02-40020-01-JAR, 2002 WL 1634440, at *1–2 (D. Kan. June 11, 2002) (denying motion to suppress for racial profiling where officer did not know suspect's race before the stop); *United States v. Villanueva*, 157 F. Supp. 2d 1184, 1190 (D. Kan. 2001) (rejecting racial profiling claim where officer could not see characteristics about the driver before initiating the traffic stop).

Setting this fact aside, even if the court were to accept plaintiff's argument that defendant must have been able to tell plaintiff's race before making the traffic stop, plaintiff has not submitted any other facts suggesting a racial motivation. Plaintiff does not allege that defendant used any racial language or other behavior that would suggest racial motivation. *See Marshall*, 345 F.3d at 1168 (recognizing that an officer's "questions and statements to the person involved, and other relevant circumstances may support an inference of discriminatory purpose"). Plaintiff suggests that because defendant assumed the two vehicles were together and he referred to plaintiff's vehicle as the "second vehicle," defendant was making racial judgments. This inference is unreasonable and unsupported by the record. Plaintiff also states that defendant's given reason for following the vehicles—that he was suspicious of a commercial van leaving a residential area after business hours—is suspect, as it differs from defendant's sworn affidavit in this litigation. Defendant's testimony, however, is not inconsistent. Defendant's affidavit does not specify why he followed the vehicles; it merely states that he began driving in the same direction as the vehicles after observing them.

But even if the facts were sufficient to infer discriminatory motivation, plaintiff has not provided facts suggesting a discriminatory effect. "To establish discriminatory effect, a [driver]

-10-

asserting race-based selective enforcement in a traffic stop or arrest must "'make a credible showing that a similarly-situated individual of another race could have been, but was not, [stopped or] arrested . . . for the offense for which the defendant was [stopped or] arrested.'" *United States v. Alcaraz-Arellano*, 441 F.3d 1252, 1264 (10th Cir. 2006) (quoting *United States v. James*, 257 F.3d 1173, 1179 (10th Cir. 2001)). A plaintiff can make this showing by offering statistical evidence.

Here, plaintiff submitted the videos of other traffic stops, but taken in the light most favorable to plaintiff, nothing in the videos suggests that defendant treated plaintiff unfairly or improperly in comparison to how he treated others or would have treated others in a similar situation. It is true that defendant did not take precisely the same actions in every situation, but police officers must make judgment calls and evaluate each traffic stop based on its own circumstances. Some traffic stops took longer than others, and defendant issued citations at some times and not at others. But plaintiff has not submitted any videos that suggest that defendant's treatment in this situation of plaintiff differed from how he treated Caucasians or would have treated Caucasians in the same or similar circumstances. Nor has plaintiff submitted evidence reasonably suggesting that defendant regularly and intentionally treated African-Americans differently than he treated Caucasians.

Plaintiff also submitted a Wikipedia document showing that the city of Leawood, Kansas is 95.19% White and 1.46% African-American. But even if these statistics are accurate, they bear no connection to the number of drivers that defendant pulls over or gives citations. Plaintiff's statistical evidence is insufficient to reasonably suggest that plaintiff was subjected to a discriminatory effect.

As a final note, it is somewhat unusual that the court would have as many videos submitted to it for viewing during summary judgment proceedings as it did in this case. In its review of the videos, the court did not evaluate the credibility of the actors or make other assessments that would

properly be left to the jury.  The court viewed the videos with one objective in mind: to objectively determine whether they created a genuine issue of material fact as to whether defendant acted in the manner alleged by plaintiff in this case.  Viewed in the light most favorable to plaintiff, the videos did not create a genuine issue of fact for a jury to determine.  Defendant is entitled to summary judgment.

**IT IS THEREFORE ORDERED** that Defendant's Motion for Summary Judgment (Doc. 17) is granted.

Dated this 3rd day of June 2009, at Kansas City, Kansas.

**s/ Carlos Murguia**
**CARLOS MURGUIA**
**United States District Judge**